My name is Kate Hendricks and I represent the appellants Chase Jarvis and Chase Jarvis Inc. This case arises from an extraordinary disregard of a photographer's rights, both because there were the 106 unauthorized uses, 105 failures to credit. Why did Judge Gillick plan to manage to get all of these cases with 99,000 issues? There are a large number of issues. I think Judge Zilley would like to know, too. And hopefully the appellants will not be penalized because there are so many issues. Could I ask you to focus, we have your briefs, at least I know you want to talk about a variety of issues including the damages. Can you sort of help me understand the collective works aspect of the case? Yes. The collage. The collage, yes. As I understand, and I've got this fancy fold-out picture, which is, I forget what the, let's see the ER, but it's this one. Yes. As the record reflects the judge showing. Yes, I was just going to say. I'm looking for the ER number, but I don't see it. It goes to the brief appendix B and is also one of the exhibits. Okay. Yes. The team ad, right? The collage. All right. And there are also Seth Pistol ads. Yes. I know there are others, but just to use this one, there are big green X's and circles. Are those all of Mr. Jarvis' images that appear in this? Yes. Okay. And what we're looking at here is what was first of all displayed originally, legitimately, and then this was then transferred onto the website. Is that correct? Correct. Okay. And displayed there. And displayed there. So what is your theory into the collective work situation? Well, the context for the 201C argument or issue is that it was lobbed in at the end of the trial to excuse 16 of the infringements, or actually there are 24 uses of Mr. Jarvis' photographs. The court found that some of them were not registered and therefore not dealt with in that respect. But these collage ads, we contend, are not subject to 201C's privilege for four different and independent reasons. First of all, there was a contract under which the license to use these images expired at a certain moment in time, and the print ads were presented on the website after that. So that would just wipe them. We wouldn't even have to get to the collective works issue because none of them was still permitted. Correct. And that would be perhaps the narrowest basis upon which the court could address that issue and reverse on the issue of 201C. Ms. Hendricks, if that's the case, Many times contributions to collective works are made as contributions. You may publish my article in your magazine. So the license is a license to use it in the collective work rather than a license to use it for some temporal period. Well, let me ask you the question in a different way. If Mr. Jarvis had had a similar contract with National Geographic that limited it to a year, would your argument be the same that if his pictures in an old issue of the magazine had been collected along with all the other issues of the magazine and put on the CD more than a year later, that it would be a violation for which no privilege under 201C would attach? Yes, yes. So the one issue would be the license expiration. Also that the works as presented on the web were a public display, that these print ads are not in fact collective works, but as the terms are used under the 1976 Copyright Act, that they are derivative works. And finally, the issue that the National Geographic, Faulkner, and Tassini cases dealt with, whether or not they're revisions. We contend that they are not revisions merely because they are used electronically, that they are presented as part of other works. That is the website web presentation. And therefore, that they are not revisions. How does that differ from the argument that they're derivative? Aren't they part and parcel of the same thing, that if it's not a revision, then it is derivative? When I pulled out this exhibit, you said, yes, this was how it appeared originally, and this is how it appeared on the website. But if that's the case, then that's analogous, is it not, to the Faulkner National Geographic case, isn't it? It is analogous in that you're dealing with the same issue, but it's really, I think, a flip side of Tassini. Tassini deals with whether, if you put the ads on the website, and then you can access the individual components of the collective, that that is not a revision because you're presenting each of these works outside the context of the way that they had been presented in the original collective work. In this instance, what we're saying is that these collective works are being presented as part of a larger work. In other words, you're not merely presenting the print ad, again, in electronic form, but you're presenting a website of which this print ad is now a part. And so you can zero in and you can manipulate and you can take off one of the images, Mr. Jarvis's images, and play with that, so that's different from a magazine situation? No, that it's not that you can separate it, but because it's part of a bigger presentation, that it's not merely a revision. I'm really having a hard time understanding the difference between collective works and derivative works. Because it seems to me that going back to Faulkner, if it's okay to gather up all the prior issues of National Geographic, collect them on a CD-ROM, allow people to search through the CD, pull out individual articles or individual pictures if they want to. I'm trying to understand how that's different from the factory team archive on the web that also contains Mr. Jarvis's work. Well, I'd like to address each of these four issues, and I can begin with the distinction between a derivative work and a collective work. I think Nimmer says that logically we could describe collective works as a form of derivative work, but that that is not how the 1976 Act was drafted. A collective work is merely a collection of individual works which are presented as an anthology or a periodical. A derivative work is something that recasts the original work or transforms it, makes it into something else. And it's important, I think, to remember that here, when we're talking about the Jarvis works, we're talking about individual slides, individual film transparencies, which were given to K2 to use in its advertisements. K2 made a poster which transforms those individual images from transparencies to prints, some of which are in a different form, some are in a different shade, the sepia tones. But the posters, the print ads themselves, were intended as one individual work. They were tear sheets from magazines which could be used as posters, and therefore, I think, more fairly meet the definition of a derivative work rather than a collective work. The authorized use by K2 of the print ad is itself a derivative work? Yes. Derived from the copyright in the image that is owned by and licensed to K2 by Mr. Jarvis? Yes. And then they take that image and they create it as part of a collage. A poster, which is an individual work. So that is the work, and your argument is that then that is time limited. Correct. And that's that use. And then when they do, then they take that derivative work that they've now made and transform that or transfer that onto a website, that's a new derivative work? No, the argument is not that it's a new derivative work, but that 201C only provides this limited privilege of copying and distributing for collective works, not for derivative works. 201C is limited to collective works, and that's why that issue is important, the distinction between derivative and collective works. Okay, so where does collective work come into the picture here? What is the collective work? We don't think there is a collective work or that 201C is applicable in any way. Okay, so let's just go back to the National Geographic. I'm having the same trouble that Judge Tallman is. National Geographic, I give you my print, my image. You put it in a story that's got text. It comes out in a magazine. So at that stage, what has National Geographic done, a derivative? The magazine is a derivative work? No, it's a collective work. It is a collection of photographs and articles, and the copyright that National Geographic owns is the copyright in the selection of the particular articles and photographs. That's their derivative? Presented. That's their collective work? Yes. You say that's the collective work, and yet what K2 did when it took Mr. Jarvis's image and put it as part of their poster, made it into a poster, that was a derivative work? Yes. Okay. Because in putting the images in the poster, they were transformed into something else. In the National Geographic, you might have a single photograph, and we don't have to decide here today whether changing it from a slide to a print is enough, but the images were actually changed in some ways. I think that was helpful, and I hope my question is not going to further confuse us all, but let me try it. If K2 had simply taken Mr. Jarvis's images and posted them on the website in an archive of prior advertising without putting them in a poster so you'd have a collection of one image after another that they had used over the earlier years, would that be a permitted exception under 201C as a collective work? No, because the 201C expressly contemplates the notion of the license or the transfer. And in this instance, Mr. Jarvis said, you may use my images, but only for one year. I understand you have a separate temporal argument, and I don't want to deal with that yet. I'm still trying to understand the difference between collective and derivative works. Let's assume for purposes of my question that K2 had done this during the period of the year. Would it have been permissible for them to collect all of his images and put them on their website? As part of their advertising, yes. They had electronic rights on the web for one year from the day of delivery. And that would be a true collective work if that's all they did? If they merely assembled his photographs of the factory team and placed them in an archive that did not include other things. Okay. Yeah. Okay. All right. Thank you. Now, one of your arguments is that they didn't have the right to publicly display, is that correct? Yes. So you're saying that even assuming 201C does apply, it doesn't include the right to publicly display. Yes. Explain that to me. I mean, how is it not a public display when somebody can go to a CD-ROM of the National Geographic and see them? Well, the difference there is that it is an individual who is using it much like they would use a book, rather than a public display as that is described. Can the difference be explained because National Geographic employs the photographers under an entirely different licensing system than is employed by the shoots that we're dealing with? Yes. I think that the license – We don't know what – we don't know on what basis National Geographic obtains color photographs of places from all over the world. Correct. And they may be different from photographer to photographer. And, in fact, the cases do identify that there are some photographers who restricted the use of electronic or reserved to themselves electronic rights. Correct. And Mr. Jarvis's reservation of all the rest of the time should be treated no differently. No, I understand that. I accept that it can be modified by agreement. I'm just trying to understand this apparent term of art of publicly display. Well, the – I sort of thought the National Geographic on the newsstand – well, it's not on the newsstand, but in the libraries, wherever, when it's sent around, it's being publicly displayed. And if you just transfer it to CD-ROM and it's okay as part of the collected work exception. The – well, the individual copy would only be observed by the individual, say, who was purchasing it. And the CD-ROM is for individual use and would not be a display that could be received in several different places by other members of the public. Okay, so it is a term of art. But what if K2 had taken one of his images, which I assume they did, and used it as an advertisement in a skiing magazine? Wouldn't that be a public display? I don't believe that it would be. The individual image would be viewed by an individual when he or she opened the magazine. So it would not – it would be a display. But the distinction is whether it is a public display, meaning – So his agreement with K2 would not have permitted one of his images to be the cover shot on a skiing magazine if K2 had supplied it to the publisher of the magazine? It would have permitted him – it would have permitted the use of the photograph on the cover as an advertisement for K2, not an editorial use for the magazine. Okay, and then if that had happened, then how – is that different from a public display by putting it on the web? Well, to display a work is to show a copy of it to someone. So with each individual magazine, you may show a copy of it to someone, either directly or by means of a film, a slide, a television image. But to display it publicly is to communicate it to the public by means of a device or process, whether the members of the public are capable of receiving the display in the same place or in separate places and at the same time or different times. That's the definition. So the Copyright Act makes a distinction between display, which would be the magazine, and public display, which could be on television, on the web, or something such as that. And indeed, in the Tassini case, the Register of Copyrights argued that the displays were public displays, and the court didn't reach that issue because it decided that they were not revisions in that particular context. I see – Why don't you – I appreciate the – go ahead and address briefly the highlights of the damage issues you want us to focus on. We have read your briefs, believe me. You've spent a lot of time reading these things. I see I have 36. Go ahead. I'll give you a little time just to set the table. Well, one of the important damage issues is with respect to these slides, and one aspect of that that I would like to talk about is the course of dealing between the parties because there were multiple delivery memos that were sent from Mr. Jarvis to K2. And under the terms of the UCC and Article 2, which would be applicable here because we're talking about a bailment of these slides, that is, the delivery to K2, the course of dealing will add contract terms. And Washington law is clear on that subject. In Puget Sound Financial and Unisearch, which I submitted recently, the court held that sending repeated delivery of a particular form can add contract terms. I read your 28J letter and the case, and the concern I have is really, I think, a proof question, and that is, given the fact that he can't remember and doesn't have records of which images were supplied from which shoots, how is he going to be able to prove that he had a course of dealing for a particular image prior to the entry of the two written contracts that the district court found were fully integrated? There is no issue in that he sent a delivery memo with every set of slides that he sent. No, no, no, that's not my question. It's a question of nexus between a particular image for which he seeks damages today, being able to tie it as a matter of proof back to that time period before he had a written contract. Your argument is post-contract, isn't it? Well, the first transaction that he had with K2 was the delivery memo and an invoice only. Okay, let's take that transaction. As I understand the record, and help me, maybe I misunderstood, but as I understand the record, the district court found that because of proof problems, he just didn't keep very good records, I guess, and K2 kept even worse, no one can figure out which images were supplied from which shoot and which are missing. But all of the images were covered by delivery memos, some where that was the only term that K2 had, and which put them on notice that $1,500 per slide was an industry term. Are the signed receipts available in the hands of a photographer? There are no signed receipts for the deliveries. Oh, I thought that when the delivery was made, that there was an inventory and that there was an acknowledgment of receipt. Send it back right away or something like that on there? No, there were no receipts sent back by delivery, but I don't think there's any dispute that the- There was a request for them, was there not? Yes. And the photographer just didn't get around to get them? No, I misspoke. The only term with respect to that was the- if you accept these slides on this delivery, you're accepting the terms of the delivery memo. I mean, it's the same argument that when you tear the wrapper on a CD from Microsoft that you're accepting the terms. That you're accepting the terms, that's correct. Maybe I didn't make my question very clear. Sorry. The problem I'm having is being able to tie particular images to those early days before the parties had actually entered into a written contract. Well, the sequence- Because the district court did find that the written contracts were fully integrated, and what I hear you arguing, if I understand it correctly, is we should still consider the terms of the delivery memos as course of trade or usage to modify the terms, or supplement, I guess, would be the terms of the written contracts. And for several reasons. One- But I see that as a separate question, so I don't want to go there yet. Just help me with- because as I understand it, there was a period of time before the parties entered into a written agreement where Mr. Jarvis was hired, perhaps on an oral contract, to do some shoots, and he provided some images for those shoots. And it seems logical to me, after reading your 28-J submission, to find that you could find a course of dealing with regard to the images that were supplied during that period of time. But now the problem you've got is a proof problem. He can't say which images arose from that particular shoot. Well, there were two deliveries prior to entry into the first photographic arrangement. And each of those put K2 on notice that the $1,500 term was an industry standard. Okay, but now you're back to the argument that you're pressing on us, which is regardless of what the written contract said or didn't say on liquidated damages, we should supplement that written contract by this $1,500 damage fee. Then the photographic arrangement is made, and that provides that it's complete as to the subject matter of the terms. And then the delivery memos continue, and there are, I believe, three deliveries after that, each of which also includes the delivery memo. And then there is the second photographic arrangement and some three or four delivery memos and deliveries that follow. So is your argument that the delivery memos are the constant across the entire range of dealings? So any images that can be tied to some form of infringement, whether it's before or during or after the written agreements, are still subject to this $1,500 notice? The delivery memos accompany each delivery of slides, the physical embodiment of these images. I understand what you're saying. I'm asking for the conclusion. Yes, and that is the conclusion. Okay, thank you. That that creates a course of dealing with respect to the slides. So the proof problem is, as I understand your argument, not a problem because any image that was infringed, it doesn't make any difference when in the course of conduct. They all were subject to your delivery memos. Yes. Okay, so you don't have to have a nexus to a particular delivery memo. Correct. That's your theory? Yes. Okay, thank you. All right, why don't you say one more question, then I'll let you sit down so we can hear from your opponent. If we were to agree on the – let's suppose we agreed on the collective works. I don't know whether – I have no idea. But the 24 images that are subject on these collage ads, if we were to disagree with the district court, what would that mean as far as – and did not do anything to disturb the damage awards. What would that mean insofar as your case is concerned? What would the relief be that we would grant? There would be 24 additional infringements. Okay. And of those additional infringements, some were first infringed subsequent to the registrations, and we've identified a third registration in the record that was perhaps inadvertently neglected. So what would be appropriate would be to remand to the district court for a determination of damages, either actual or statutory, and for an award of attorney's fees pertaining to those particular images. Okay, and what's – just under statutory damages, how does one prove up – because they provide for a range, don't they? Yes. How is that different from what you prove up for actual damages? It is discretionary with the court, and Judge Zille has included in his decision many factors, many findings that relate to issues of how you would make that determination. So I don't believe there would be a new trial but an assessment of what the damages should be based on willful infringement. You're not challenging his methodology. You're just challenging the failure to do it. We are challenging his methodology on damages as between rights managed and the ones that are royalty-free. Royalty-free, right. But with respect to statutory damages, there were no awards made. No, I understand there weren't. That's why I was asking the question. Yes. Okay, thank you. Thank you. I appreciate the extra time. Sure. Please don't start out by saying this is an easy case. May it please the Court. My name is Shannon McDougald. I was the lead trial lawyer. I'm also the lead lawyer on the appeal along with my colleague, Ryan McBriar, who's in the court, who was my co-counsel at trial. I will definitely not tell the Court this is an easy case. This is a complex case. When I was at UCLA being taught by Professor Dimmer, I never dreamed it would get this complex. I hope it was Mel, not David. David. Really? He turned my offer of employment down when I was a lawyer. And besides, he's just a former AUSA. What does he know? Careful. I'm sure you got Ty well. Well, the lectures were by Mel. Everyone said you learned with David. He was a little younger. I actually had to cross-examine Mel Nimmer on the stand in the copyright case. You're lucky you didn't have to ever do that. That was one of the worst days of my life. Fair enough. Let me first cut to the chase. And the chase is what is a collective work. And the statute tells us quite clearly. It's a work by two or more individual authors, photographers, submitted, joined in a collective work. I will tell you, folks, as we sit here today and we look at that image, the collage that belongs to K2, that's a collective work. As the appellate said in their own brief, the collage advertisements contain works by Mr. Jarvis, the appellate, and other artists. That's a collective work. That's the image. If that's the case, though, it's a little different from National Geographic Magazine because, as counsel points out, the images have been modified in terms of their size. They're no longer just, I'll call them, five-by-six prints or whatever size they were. Now some of them are trapezoids. The coloring is different. They're superimposed on a poster. Why isn't this more like the case involving the tiles that were sold with individual pictures extracted from the works of the copyright owner and then sold for profit? The answer here is that, again, let's go to this issue of derivative works, not raised at the lower court, raised for the first time on appeal. When we look at the image, that is, the one in the exhibit the court has seen, the image there and the image on the web are the same. The difference is, of course, in size and scope, right? But the image ---- And mounting? I mean, they're presented in a different way than as individual pictures, which I assume is what Mr. Jarvis gave to K2 original. Actually, one important factor that the trial court had was, of course, Mr. Jarvis provided the image to K2, but in making the collage advertisement, Mr. Jarvis, the appellate's advertising firm, Benchmark 10, assisted K2 in making that collage. That image that you see there is the same image that was used in magazines, the same image on the web. On the web, the difference would, of course, be that it is smaller. So your position is that what we're looking at as the original, when it was first transformed from the licensed image onto this display, that first step, first iteration, was itself a collective work? Exactly. Okay. And then when it moved from the print page onto the website, it was what? Still a collective work. When it went from the magazines, when it went from the original collage in K2's possession to the magazine to use in the web for K2, it's still a simple, single, collective work. Okay. So your right to do that depends on whether you had the right to take the next step. That's the temporal limitation of the agreement. And the question, at least as I understand it from Faulkner, as to whether that transformation manipulated the print onto a format that was now would have to be justified as a revision. Is that correct? In some ways, Your Honor. The issue is, for the derivative issue, the transformation has to be substantive. As you know, the Copyright Act itself is media neutral. The fact, medium neutral, that is, the fact that it moves from print to the computer to magazine doesn't matter. The issue is whether the substance, and this is where Tessini and Faulkner are illustrative, whether in substance its context changed. And I would submit to the Court that that image that you see there, whether you see it there, you see it in the magazine, you see it on the Web, is the exact same image. Is that right? I mean, let's take the factory team collage. Is that how it was originally presented when it was used in advertising, with all those images? All the images are together, as used in advertising. And all the images are together. That's not my question. Oh, I'm sorry. My question is, I mean, aren't these a collection of individual ads as opposed to the entire, what I'm holding here, the factory team, I'll call it the Web image? What you're holding is the image. That was the advertisement. Before it went on the Web. Yes. That's what they did. They made the collage advertisement. That was the pullout. Oh, okay. I must have misunderstood that from the briefing. No. It's not different. That is, the Web isn't different than the actual advertisement. Because there was an issue in Faulkner as to whether or not the 20-second voiceover or whatever it was had actually changed the composition so that it was a new collective work. You're saying that's not the case? Not in the case here. The images from beginning to end are the same. But it does appear on a Web site, so it's now surround. It's different, at least in the extent to which it's been presented. It's a medium of transmission. Well, no, I understand. But if it appears on a Web site, it's surrounded, is it not, by other things that are inherent in the Web site. In other words, what we see in this page, we don't see anything else except the images and what's embedded in what you say was the original pullout. If this now pops up on a Web site, will it then have a banner for K2 and it will have advertisements off to the side, other things, so that it's embedded in a larger presentation? The answer is when the advertisement was used in the magazines, when it was used on the Web, there were always surrounding materials. In the magazine, there were other ads, other articles. On the Web, when you access it on the Web, you will see the K2 surround information. That is, there will be a K2 logo at the bottom. That's whose Web site you're on. But it's like the image. And remember, under 201C and under the Copyright Act, a revision that is modest, that doesn't change it in substance, is allowed. That's the point. I understand. That's why I was raising the revision point. But the Faulkner case spends a lot of time, descriptively, on how much identity there was between the original National Geographic, even going so far as to point out that on the CD-ROM, because it was scanned, you could see the gutter or the break in the page. So that's why I'm wondering about the extent that they had the introduction where the images could be manipulated. I think that came up in the 11th Circuit case more so. And Greenberg. Greenberg, right, that case. Which was essentially a variant of the same case, obviously. And I'm just, because I know the copyright, I'm not sure it's all totally media neutral because of the differentiation that one wrestles with when you transform it into something that's much more interactive and manipulable than the old print pages. So I'm just trying to visualize how this plays out, at least in the way the Faulkner case went through the analysis as to the identicalness of the two images, the two presentations. The record at the lower court was clear. And let's talk a little bit about the differences between Ticine, Faulkner, and Greenberg. When we look at those cases, Greenberg decided by 11th Circuit three weeks before Ticine's issued by the Supreme Court, one of the things that the court didn't like was the morphing of images. That is, you took someone's image, you could morph it, you could change it. And Ticine, the Supreme Court didn't like the idea that the copyright protected for the author was being violated, not because it was being used in a collective work, but because when you went to LexisNexis, something all us lawyers know about, you could actually pull the individual article. The record in this case, those two things didn't happen. You couldn't pull images off the web individually from that collective work. That's not the record in the lower case here. You also didn't have morphing. The image you see there is the image you got on the web, albeit smaller, albeit on the K2 website. All right. Again, I want to address a couple of other. But before you move off that, let me make sure. I don't mean to beat a dead horse. I'm looking at SP5. And where was that from? That is also, I understand it, an image that was used in advertising and promotion for K2, originally authorized, and also in the archives. Remember, we're talking about archives of K2 advertisements. Right. The archives are the exact same image that you have there. So if I went to a magazine or whatever medium, non-electronic, that's what it would look like? That's what it would look like, yes. They sold a lot of skis with these ads? Actually, they weren't used to sell skis. They were used to promote the athletes. Mr. Zepp-Pistol was quite famous with young folks. Okay. Okay, so assuming then the original factory team ad is a collective work, then your argument is that you had the privilege to come along later and post that on a website, just transfer it on the media, making no other changes, that anything that was done would be a permissible revision, I take it? A revision to the extent that there's the outside border for the website. We reproduced the image digitally on our server, and then we allowed it to be distributed on the web. Now, the two arguments that are made by the plaintiff here is that one is that it has now become a public display. You've heard that, so I'd be interested in your response on that. And then the issue of whether you were privileged under 201C, notwithstanding that you had a temporal restriction on the original license. So if you could just give us a quick contextual response on that now. I will do my best, Your Honor. First, on the public display, I think it's important to recognize that no circuit in the U.S. has said that having information accessible on the web constitutes a public display for purposes of the collective work privilege. Well, we like to be cutting edge, so if nobody has said that it is, I'm more interested in if somebody said that it isn't. Unfortunately, in Tassini, they didn't address the issue. In Faulkner, they didn't give detail to the issue. But from a practical standpoint, I think it's important that we recognize that whenever you have a collective work, with the exception of some limited areas, they are always subject to an ultimate visual depiction. And what the appellant is arguing here is that the distribution of any collective work on the web would not be allowed, the privilege would not be accessible to this international technology. Why? Because they're arguing that merely giving the public access to information, the ability to access the data, is a public display. That's not right. That's not how the Copyright Act reads. There is no one who can walk by and say they saw this image being displayed, but there are people who can say, if I have a computer, if I access their website, if I went to the archive, I could download, distribute, we know that from the Napster case, that image to my computer. Again, from a public display standpoint in the Act, does access on the web constitute a public display? We would argue it does not. The fact that you have a visual depiction of an image ultimately downloaded to your computer, again, we would argue that's not a public display, it's merely access. What is the Internet? Was there a public display when they were originally printed in the magazine then? In my view, I would argue that there is a public display of magazines sitting on the newsstand at Pike Place Market. That's a public display of the image, but of course- Of the image of the cover or the image of the contents? I would argue the image certainly of the cover, and I think you could argue that the contents as well- Are public display, so if all magazines are by definition then under the Copyright Act public displays? Certainly the face image, I wouldn't say all magazines, but I'd say it's a placement issue, right? If I have a magazine, no one can see the cover, I would say that's not a public display. Well, obviously. But if I post it- You put the Playboys behind these barriers. But if I post it on the corner, that image, certainly the cover image, would be a public display. When I go to the museum, it sits out in front on the corner, that's a public display. But if it's a book in a library, if it's a magazine in a library, National Geographic doesn't sell itself, for example, on newsstands. What it does is it does it out to subscribers. Is National Geographic on public display? I would say that if it's not, again, publicly displayed, I'm talking about the physical public display, it is not a public display. Okay. And so you're saying that a pull-out ad, which is not on the cover, this factory team ad, was or was not on public display? Because it wasn't a cover, correct? It was in a ski magazine, it wouldn't be on the cover. The pull-out ad wasn't a cover. Right. So was that on public display? In the record in the lower case, we never reached that, Your Honor. As a matter of law, I mean- That would not be on public display. Okay. So now, pulling it out of the pages of the magazine, now it's up on the Web, now you think that clearly is or isn't public display? It is not, again, a public display to have information, data, accessible on the Web to someone who chooses to access it. They still have to, in effect, open the book, open the magazine to get to it. There are a minimum of four and probably five steps. One, you've got to turn your computer on, you've got to go to the Web, you've got to access the K2 site. At the site, remember these were not the cover page, you then go to archives. Within the archives, you do a search looking for Zeph Pistol or looking for the K2 factory team. You then have access to the data. Again, if we want to suggest that no collective work can be accessible on the Web, the appellate's argument can be- No, I understand, Father. Why don't you move on because we don't want to take up all afternoon here. Address the temporal limitation. Faulkner, the Faulkner decision is educational on this point. They made clear, as in Dessini, the limitations on the license to use that particular image. Unless there is a restriction on use of an image in a collective work- It also said it was ambiguous. The terminology was ambiguous. The terminology is ambiguous. The key would be- That is in Faulkner's contract. In Faulkner's. Again, here, is there a limitation in this record in the two contracts? Again, remember, the contracts were prepared by Mr. Jervis. He wrote them. In those contracts, is there a limitation for the collective work use of those images? I would submit to you at the trial court level, there was no such restriction. When Judge Zille reviewed the issue, he had that information in front of him. I'm sorry. At the trial court, there was no such restriction? There's no such restriction. He found that or he wasn't argued? He didn't find a restriction in the contract limiting the collective work use of the images. Is that the meaning of the phrase under the usage provision of the contract on page 3, where it talks about electronically for the web so as to market their business? Is that the relevant portion of the contract that addresses what you were just talking about? I would say it isn't, Your Honor. It's not? It is not because it addresses electronic use of an individual image. It does not address the collective work use of images. That's the problem. We don't have in the contract prepared by the appellant. That issue was not addressed. Let me cut to an important point, and that is the contracts. Judge Zille made a determination that they were fully integrated. Under Washington law, whether a contract is fully integrated is a question of fact. It is reversed only if there is clear error, not if it might be wrong, not even if it's probably wrong under the Ninth Circuit standard, right? The standard for a finding of fact is clear error. Judge Zille made that determination. That's important because once we have integrated agreements, any modification of those agreements under the UCC adopted in Washington 2209, the modification has to be a signed writing by both parties. Here that never occurred. In fact, at the trial court level, there was no evidence on the K2 side of K2 having in its possession the actual delivery memos. They didn't have them. Mr. Jarvis also couldn't produce them that he had produced to Benchmark 10, his advertising agency. Your Honor, if I have 30 seconds, I'll mention damages. I'd let the other side go over. On the issue of damages. Yes. Judge Zille had available to him for the three areas of damages at the trial level, not merely the examination of the parties in the documents, but he also got to examine them exactly regarding the value of the images. And what he used, as opposed to what appellate suggests to the court, wasn't royalty-free, wasn't rights-managed. It was a compilation of all the information he received concerning the value. And the damage figure he chose for the infringements, in fact, turned out to be three times higher than the average copyright licenses that Mr. Jarvis and his company received for their images. As to the credit use damages, Mr. Jarvis and his expert both testified it would be speculation. They couldn't identify any actual damage, yet the court gave them a damage award. As to the value of the lost images, again, when they walked through all the evidence at the trial court level, Judge Zille, based on his findings of fact and law, made a determination as to the value. And unlike Ticini, unlike Faulkner, unlike Greenberg, we actually had a trial here. They weren't decided on summary judgment. The parties had their day in court. What's your response to my question to Ms. Hendricks about her 28-J letter and how we ought to apply, if at all, the Washington cases on the images pre-written agreement? My answer, Your Honor, would be that we don't apply those cases because Zille, in fact, determined that some of the pre-contract images were incorporated in the first 2000 contract. But the problem is, am I wrong in my questions of Ms. Hendricks that we don't know which images are lost? We absolutely don't know which images are lost. You're absolutely correct, Your Honor. So there is a proof problem here that the plaintiff simply can't overcome. They cannot. Okay. Thank you. Thank you. And you can tell David Nimmer that you did okay. Because I don't want to get in trouble with David Nimmer. I'll give you a minute on rebuttal. Thank you. I'd like to address first, very briefly, the collective work aspects. The 1976 Copyright Act unbundled the rights that are available to every copyright owner. The owner of a contribution, the copyright vests in that author. And so because of the unbundling and because he is the owner, he has the right to transfer to someone else some rights and to withhold others. In this case, Mr. Jarvis transferred the right to use the images for a year and no longer. And so in the contract, to come back to Judge Tolman's question about the contract, which provision in the contract do you believe puts the limitation for the year? The temporal limitation, which is that you have the right to use these images for one year from delivery. So that's the term of this contract you'll be pursuant to? Yes. And that's it? So their rights to use the images for any purposes, including electronically on the Web, expired at the end of one year. And the presumption that is available under 201C is only in the absence of an express transfer of the copyright or any of the rights under it. So the owner has the right to transfer what he will, and the presumption only arises in the absence of some express transfer. Secondly, on the question of public display, well, I think I'll hold on that. I think that public display is defined in the Act. Yeah, I think we have that. And the Web clearly meets it. With respect to the images and the damages, the only evidence of an individual licensing of an image from Mr. Jarvis to K2 was an image referenced in the decision. It was $400 plus a bike frame, and the bike frame was somewhere between $400 and $900. So the license for one image was $1,300 to $1,800, which is the only evidence of how Mr. Jarvis was licensing his works. All of the damage awards are substantially below that, so they failed to take into account what Mr. Jarvis was willing to license for. And in this instance, they're no mere splash of color, as K2 has suggested. If they had wanted a splash of color, they could have used a splash of color. But they selected Mr. Jarvis's images and should be required to pay what they would have had to pay to license them from him. Okay. Fine. Thank you both, counsel. We appreciate the argument. It's very complicated, and you've helped us navigate a bit, and you've both done very well and appreciate it. The case argued is submitted, and we will stand in recess for the day. All rise. This court for discussion is adjourned.
judges: Beezer, Fisher, Tallman